**JOHN MORRELL & CO., Plaintiff,**

v.

**UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL–CIO, and Benard J. Aning, personally and as a representative of a defendant class of others similarly situated, Defendants.**

No. Civ. 91–4184.

United States District Court,
D. South Dakota, S.D.

June 24, 1993.

Jeremiah D. Murphy, Sioux Falls, SD, Wilber H. Boies, Maria G. Arias–Chapleau, Chicago, IL, for plaintiff.

Donald R. Shultz, Rapid City, SD, Irving M. King, Chicago, IL, for defendants.

## MEMORANDUM OPINION

BATTEY, District Judge.

John Morrell & Co. ("Morrell") brought this action under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. It seeks a determination that it is entitled to unilaterally modify or terminate programs of health benefits provided to its retired hourly employees. Defendants UFCW and Benard J. Aning allege that the changes in the retirees' health benefits constitute breaches of Morrell's fiduciary duties as defined by section 404 of the Employee Retirement Income Security Act of 1974 ("ERISA"). They further claim that Morrell has dealt with assets of the ERISA plan in its own interest in violation of section 406 of ERISA, 29 U.S.C. § 1106.

This Court has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, sections 8 and 301 of the National Labor Relations Act ("NLRA"), as amended, 29 U.S.C. §§ 158 and 185, sections 502(a) and 502(e) of ERISA, 29 U.S.C. § 1132(a, e), and 28 U.S.C. § 1337.

The issue before the Court is whether Morrell has a unilateral right to change or terminate the health benefits for retirees who retired before April 1, 1989. Exhibit 36b sets forth the intention of Morrell.

Morrell contends that the retiree Health, Medical, and Surgical ("H.M.S.") benefits do not continue beyond the expiration of the collective bargaining agreement ("CBA") under which each retiree retired. Morrell asserts its contractual obligation to provide the same benefits bargained for in the CBA terminated when the CBA expired. It further alleges that these benefits are not "vested" lifetime benefits, and therefore, they may be changed unilaterally. Finally, Morrell contends that even if the benefits are lifetime benefits which cannot be unilaterally changed by Morrell, the benefits can be changed by agreement between Morrell and UFCW.

Therefore, Morrell requests the Court to order the parties to negotiate in good faith on the proposed health benefits changes for retirees.

A court trial was held on October 6, 1992. The Court submits the following findings of fact and conclusions of law, some of which were stipulated on October 5, 1992 (Docket # 103). Reference to facts which have been stipulated will be noted as (Stip. ——).

## FINDINGS OF FACT

### a. Background

1. Morrell is a Delaware corporation with its principal place of business in Cincinnati, Ohio. (Stip. C–1). It currently owns and operates meat-packing plants in Sioux Falls, South Dakota, and other locations. At various times relevant to this action, it owned and operated plants covered by a master agreement between the parties in Sioux Falls, South Dakota; Estherville, Iowa; Ottumwa, Iowa; Fort Smith, Arkansas; Arkansas City, Kansas; St. Paul, Minnesota; East St. Louis, Illinois; El Paso, Texas; Memphis, Tennessee; and Cincinnati, Ohio. All of those plants are now closed except the plant in Sioux Falls. (Stip. C–5 & C–6).

2. Morrell is an "employer" under section 2(2) of the NLRA, 29 U.S.C. § 152(2). (Stip. C–2).

3. United Food and Commercial Workers International Union, AFL–CIO ("UFCW") is a "labor organization" under section 2(5) of the NLRA, 29 U.S.C. § 152(5) with its principal offices in Washington, D.C. (Stip. C–3 & C–4). UFCW is engaged in representing employees in the district of South Dakota and has for many years been the recognized collective bargaining representative of Morrell hourly employees.

4. Defendant Benard J. Aning ("Aning") is a retired hourly employee of Morrell's Sioux Falls plant who was formerly represented by the UFCW. He has been furnished with health care benefits by Morrell, first as an active employee and currently as a retiree. (Stip. C–7).

5. Aning is a representative of the certified class.[1] As of December 17, 1991, it contained over 3,300 former hourly employees. (Stip. C–9).

6. The retiree class is a closed class and the number of persons in the class is declining through death at a rate of approximately 200 per year.

7. Morrell and UFCW (or its predecessor unions) have throughout the past forty years been parties to successive CBAs commonly referred to as "master agreements." The history of these CBAs evidences some variance as relates to retirees and H.M.S. benefits.

8. UFCW (or its predecessor unions) has also been a party to similar master agreements with other major meat-packing employers such as Armour and Company, Swift & Company and Wilson Foods Corporation. UFCW and the meat-packing employers (including Morrell) engaged in what is commonly known as "pattern bargaining." In each round of negotiations, one meat-packing company and UFCW would reach an agreement which would "set the pattern" for the meat-packing industry, and the other companies would then adopt the same provisions as a means of equalizing labor costs. This pattern bargaining resulted in the same wages and benefits and working conditions for all employees and retirees in the meat-packing industry.

9. Successive CBAs became effective on September 1, 1973, 1976, 1979, 1982, and 1985. Each of these CBAs contained an Appendix F which detailed health benefits for Morrell's hourly employees and persons retiring during its term. These CBAs covered the labor contract relations at the Sioux Falls plant.

---

1. Prior to trial the parties stipulated to a defined class for certification which provided that the class consists of the following persons who are now, and in the past have been, provided health care benefits by Morrell:

 (i) "Retirees"—persons who were formerly employed by Morrell as hourly employees at various plants and represented by the UFCW, but who retired on or before April 1, 1989.
 (ii) "Spouses"—wives or husbands of living Retirees.

### b. Relevant Provisions of the CBAs

10. *1970–73 CBA* (April 4, 1970, to September 1, 1973), (Exhibit 55).

The parties to the 1970–73 CBA were Morrell and the Local P–1 Amalgamated Meat Cutters and Butcher Workmen of North America A.F.L.–C.I.O. (predecessor of UFCW).

Referring to an earlier CBA terminating August 31, 1964, paragraph 8, page 37, provided:

> The H.M.S. benefits ... shall continue to be made available to present covered retirees who have been carrying such insurance ... at no additional cost over the amounts being paid as of the date of execution of this Memorandum by retirees for such insurance coverage at the respective plants. All retirees who are carrying such insurance coverage as of December 1, 1967, and all Employees retiring after December 1, 1967, shall be furnished such insurance thereafter at Company expense.

Thus by contract, in 1970 the retirees were included by specific contract provisions. This status of retirees was to change later.

11. *1973 CBA* (September 1, 1973—September 1, 1976), (Exhibits 1a and 1b).

Retirees continued to receive by contract H.M.S. benefits under this CBA.

Paragraph 8.12, Exhibit 1b, page 24, provided:

> **8.12 Retirement:** All retirees *currently furnished H.M.S. coverage* and all Employees who retire during the term of the Master Agreement shall be furnished hospital, medical and surgical insurance at Company expense....

(Emphasis supplied.) Paragraph 8.12 further changed benefits which had been provid-

---

(iii) "Surviving Spouses"—widows and widowers of Retirees who selected a joint and survivor form of pension and widows and widowers of hourly employees who died with twenty years of credited service.
(iv) "Other Dependents"—children of Retirees within specified ages or children (of the same ages) of deceased Retirees who selected a joint and survivor form of pension.
(Stipulation for class certification, Docket # 104). The Court approved this stipulation and certified the class in open court (Tr. 4).

ed in the 1964 agreement by (1) providing coverage of 120 days per confinement; (2) increasing miscellaneous fees to $500; (3) providing coordination with Medicare; and (4) providing conditions of coverage for those employees ages 53 and 54 who elect a separation pension.

The 1973 CBA contained a duration clause on H.M.S. benefits as follows:

### XXXI

### HOSPITAL–MEDICAL–SURGICAL INSURANCE

103. The Hospital–Medical–Surgical Insurance Plan described in Appendix F will remain in effect for the duration of this Agreement.

(Exhibit 1a, page 50).

12. *1976 CBA* (**September 1, 1976—September 1, 1979), (Exhibits 2a and 2b).**

Paragraph 8.12, Exhibit 2b, page 25, omitted the reference to "all retirees currently furnished H.M.S. coverage" as found in the 1973 CBA paragraph 8.12 and read in part as follows:

> **8.12 Retirement:** All Employees who retire on or after September 1, 1976 ... shall be furnished at Company expense effective as of the time of retirement, the following: ...

Again as with the 1973 CBA, the 1976 CBA contained the identical Article XXXI, paragraph 103, as follows:

### XXXI

### HOSPITAL–MEDICAL–SURGICAL INSURANCE

103. The Hospital–Medical–Surgical Insurance Plan described in Appendix F will remain in effect for the duration of this Agreement.

(Exhibit 2a, page 52).

Thus the 1976 CBA represented a policy shift by Morrell not to include H.M.S. benefits for past retired employees (employees who had retired at a time when previous CBAs were in effect). This CBA represents a clear intent not to include the past retirees

in the H.M.S. program by contractual agreement.

The logical inference for this change in posture is that the company became aware of the case of *Allied Chem. & Alkali Workers of Am., Local Union v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). *Pittsburgh Plate Glass* held that retired employees were not a part of the employee bargaining unit and that a bargaining agent was under no mandated statutory duty to represent retirees in negotiations with employer. It held that bargaining for retirees was permissive only and not a mandatory requirement of collective bargaining.

Neither in the 1976 CBA nor in its Appendix F is there found any express contract terms requiring past retirees to be contractually furnished H.M.S. benefits beyond the expiration of the CBA. The contract is clear and unambiguous.

13. *1979 CBA* (**September 1, 1979—September 1, 1982), (Exhibits 10a and 10b).**

The 1979 CBA, Appendix F (Exhibit 10b), page 17, provided for H.M.S. benefits to those employees retiring after September 1, 1979. It read in part as follows:

### ARTICLE IX

### RETIREMENT BENEFITS

**9.1 Normal, Early or Disability Retirees:**

> **(a) Benefits:** All Employees who retire on or after September 1, 1979, under Normal Retirement, Early Retirement or Disability Retirement (including Joint & Survivor Option for each) as provided in the Supplemental Agreement on Pensions (hereinafter referred to as "Retired Employees") shall be furnished at Company expense effective as of the time of retirement, the following:

> **(b) After Retirees Death:**

> (1) When a Retired Employee dies who has not selected a Joint and Survivors option, the surviving spouse and dependent children will continue to be covered

only for the remainder of the month in which death occurred.

(2) When a Retired Employee dies who has selected a joint and survivor form of pension, the above coverage shall continue for the surviving spouse and dependent children until the earlier of the surviving spouse's death or remarriage, or, in the case of a dependent child, until the earlier of the termination of the child's status as a dependent, or termination of coverage for the surviving spouse.

Again the contract Article XXXI paragraph 104 Hospital–Medical–Surgical constituted a limitation on the duration of coverage. The clause is similar to paragraph 103 of the 1973 and 1976 CBAs. It read as follows:

### XXXI

### HOSPITAL–MEDICAL–SURGICAL INSURANCE

104. The Hospital–Medical–Surgical Insurance Plan described in Appendix F will remain in effect for the duration of this Agreement as modified by the Memorandum of Agreement dated July 12, 1979. Details of the Health and Welfare Plan will be published in a separate booklet.

(Exhibit 10a, page 55). The Memorandum Agreement dated July 12, 1979, referred to in paragraph 104, provided in part as follows:

### HOSPITAL–MEDICAL–SURGICAL

### MAJOR MEDICAL PLAN

The Company shall provide coverage under this Plan to all persons (and their eligible dependents) employed by the Company *in a bargaining unit* [2] covered by the Master Agreement....

(Exhibit 6, Appendix B, page B–1; emphasis supplied).

Nothing in the Agreement referred to past retirees. Retirees by contract referred to those employees who retired after September 1, 1979, the date of the commencement of the 1979 CBA.

14. In connection with the bargaining conducted prior to the effective date of the 1979 CBA, much discussion was had during the trial to a side letter dated July 12, 1979 (Exhibit 7). The letter was written by M. Lee Bishop on behalf of Morrell and accepted by Jesse Prosten on behalf of UFCW. The letter read in part as follows:

During the course of the 1979 contract negotiations, the Union presented to the Company certain requests for improvement in the health care benefit program for employees who retire prior to September 1, 1979 ("Past Retirees"). The Company has taken the position that it has no legal obligation to bargain with the Union with respect to the benefits of Past Retirees.

Without any waiver of the legal position of either party, however, the Company has advised the Union that, as a matter of Company policy, the Company intends to announce that effective September 1, 1979, the Company will extend the following benefit programs to retirees currently covered by a Company H.M.S. and who have retired prior to September 1, 1979....

The clear message of this letter is that Morrell was not bargaining for H.M.S. benefits (or for that matter any benefits) for those persons who had retired prior to September 1, 1979 ("past retirees"). Again, without express reference to *Pittsburgh Plate Glass*, it is clear that the Company was maintaining its position that it was not recognizing UFCW as the bargaining agent for past retirees. Witness William Burns, negotiator for UFCW, admitted that *Pittsburgh Plate Glass* was an issue discussed. (Tr. 392). William Burns was the assistant to UFCW's chief negotiator and chairman of the health and welfare committee at the bargaining table. As a result, any H.M.S. benefits for those persons were to be provided as a result of the administrative policy of Morrell to

---

2. Exhibit 10a, Appendix A, page 59, defines the bargaining unit for Sioux Falls as "[a]ll the employees, excluding supervisors, foremen, assistant foremen, all general office employees, all salesmen, and the over-the-road drivers." The Court notes that retired former employees are not included.

recognize past employees for the contributions which they made to the Company's success over the years. The testimony of William Burns is as follows: (Tr. 415).

Q Did the company tell you it intended to announce effective September 1, 1979, the company would extend the following benefit program to retirees?

A Yes. Yes, they did.

Q Did the company tell you they were going to do that as a matter of company policy?

A We drafted the letter; they agreed to it and the letter says what it says.

Q Mr. Burns, I am not asking what the letter says. I am asking you did the company tell you that they intended to do this, to make these changes as a matter of company policy? That's exactly what they told you, isn't it?

A They said they were going to make the changes, correct.

Q They told you they made the changes as a matter of company policy, didn't they?

A Yes, they did.

Q And you read that letter at the time?

A Yes, I did.

Q You understood that it was accurate when it said they were going to make these changes as a matter of company policy? That was an accurate reflection of their position?

A Yes, it was.

Q You initiated the letter?

A Correct.

Q Indicating your acceptance it was accurate?

A Yes.

. . . . .

Q All right. This company was taking the position that it had no legal obligation to bargain with the Union with respect to the benefits of past retirees, wasn't it?

A Yes, it did.

Q That's what they say in the letter?

A That's correct.

. . . . .

Q Mr. Burns, the letter says the company has taken the position that it has no legal obligation to bargain with the Union with respect to the benefits of past retirees. Do you see that sentence?

A Yes.

Q You told me that was an accurate statement of their position in 1979?

A Yes.

Q It is, isn't it?

A Yes, it is.

15. The respective CBAs were never submitted to a vote of the past retirees. None of them were invited to the bargaining sessions. There was no bargaining unit consisting of retirees.

16. After the 1979 agreement expired on September 1, 1982, active employees represented by the UFCW at all plants covered by the master agreement engaged in legal economic strikes. Morrell ceased providing health care benefits for striking employees at its own expense, and instead provided coverage only if paid for by the striking employees. (Stip. D–5).

17. During the strike referred to in the preceding paragraph, Morrell continued to provide health care benefits to members of the retiree class. (Stip. D–6).

18. *September 11, 1982* Agreement.

On September 1, 1982, a new collective bargaining agreement became effective between Morrell and UFCW pursuant to a Memorandum of Agreement signed by the parties on September 11, 1982. It contained an Appendix F setting forth health care benefits for active hourly employees and dependents, including hourly employees who retired during the term of the 1982 agreement. (Stip. D–7).

The 1979 CBA by its terms expired September 1, 1982. Normally negotiations for a new CBA would have been conducted during 1982; however, a new CBA was not concluded. (Tr. 51). Instead, a Memorandum of Agreement dated September 11, 1982, Exhibit 11, was signed. The lack of a formal 1982 CBA is not significant. The effect of the

1982 agreement was to extend the Master Agreement then in effect (1979 CBA) for another three years, September 1, 1982, to August 31, 1985, with certain exceptions. In the 1982 agreement there is no reference to retiree benefits.

19. After the amended 1982 agreement expired on September 1, 1985, active employees represented by the UFCW at all plants covered by the master agreement engaged in legal economic strikes. Morrell ceased providing health care benefits for striking employees at its own expense, and instead provided coverage only if paid for by the striking employees. (Stip. D–9). It continued to provide H.M.S. benefits for retirees.

20. As explained earlier (Finding # 8), CBAs for major packing plants in the United States were arrived at through a process of pattern bargaining. The purpose was to permit them to remain competitive with each other. Wilson Foods Corporation was one of these major competitors. Wilson Foods suffered financial setbacks and filed for bankruptcy under Chapter 11 (reorganization) in 1983. This created a desire on the part of Morrell to renegotiate the 1982 agreement because Wilson Foods had drastically reduced wages and benefits under its bankruptcy. If Morrell were to remain competitive it would have to do likewise. To reduce wages and benefits would require a new CBA. (Tr. 52–53). Accordingly, Morrell and UFCW renegotiated the terms of the 1982 agreement. The task of the 1983 reopener negotiations was to bring about a reduction in Morrell's wages and benefits to restore its ability to compete with Wilson Foods. Substantial wage cuts were made. Medical benefits were changed to provide for copayments and deductibles as well as adjustments in eligibility.

The negotiations resulted in the 1983 Memorandum of Agreement dated September 24, 1983 (Exhibit 12).

21. *1983 Agreement* (October 3, 1983, to August 31, 1985 (Exhibit 12).

The amendments to the health care plan (page 8) set forth the changes. In general, the health care plan provided for reduced benefits, cost sharing, and deductibles.

Paragraph (f) provided as follows:

(f). Appendix F of the Master Agreement shall be amended to provide that present retirees, and employees retiring during the term of this Agreement, and their dependents, shall be covered under all coverages of the foregoing plan, ...

Exhibit 12, p. 9.

The Court finds that the 1983 agreement was an agreement to renegotiate the 1982 CBA and the reference to present retirees in paragraph (f) referred to those persons who had retired under the 1982 CBA. To extend the meaning to *all* retirees *whenever retired* would read into the agreement terms going beyond those of the 1982 CBA.

22. **1982 CBA (September 1, 1982–September 1, 1985) (Exhibits 13a and 13b).**

The 1982 CBA did not become effective until January 1, 1984. In the interim period after the 1979 CBA expired (September 1, 1982) and January 1, 1984, the agreement of September 11, 1982, (Exhibit 11) and October 3, 1983 (Exhibit 12) constituted the Labor–Management Agreement in the absence of the formal Master 1982 CBA. Finally, however, the 1982 CBA was completed effective January 1, 1984. (Exhibit 13a).

In the 1982 CBA H.M.S. benefits were defined as follows:

### SECTION A. HEALTH–CARE BENEFITS FOR ACTIVE EMPLOYEES

#### Article I—Definitions

1.1 An "Eligible Employee" shall be any regular full-time employee other than as indicated below, ... The following shall be ineligible for coverage:

a. ...

b. Individuals who have quit or have been discharged or terminated from employment.

Exhibit 13b.

Nothing in the agreement refers to past retirees. On the contrary, page 29 of Exhib-

it 13b contains a section on retirement benefits for "all employees who retire during the term of this Master Agreement." Paragraph 1.1(a).

As with prior CBAs, the 1982 CBA contained a limiting clause as to H.M.S. coverage.

## XXXI

## HOSPITAL–MEDICAL–SURGICAL INSURANCE

104. The Hospital–Medical–Surgical Insurance Plan described in Appendix F, attached to the 1979–1982 Master Agreement, will remain in effect for the duration of this Agreement, as modified by the Memorandum of Agreement dated September 11, 1982, the Memorandum of Agreement ("Estherville Agreement") dated June 30, 1983, the Memorandum of Agreement ("Sioux Falls Agreement") dated effective October 3, 1983 and the Memorandum of Agreement ("East St. Louis Agreement") dated December 11, 1983. Details of the Health and Welfare Plan will be published in a separate booklet.

The termination clause is substantially the same as clauses in previous CBAs.

23. *1985 CBA.* (November 20, 1985, to November 19, 1988), (Exhibits 21a and 21b).

The 1982 CBA and its Appendix F had an expiration date of September 1, 1985. Negotiations between Morrell and UFCW resulted in a Memorandum of Agreement dated November 18, 1985 (Exhibit 19). This agreement formed the basis for the 1985 CBA covering retroactively the period of November 20, 1985, to November 19, 1988.

The purpose of the November 18, 1985, agreement was to continue the 1982 CBA pending approval of the formal 1985 Master Agreement. The customary procedure was followed, that is to say, the practice of the parties was to cover by a memorandum of agreement the period between the expiration of one CBA and the commencement of a succeeding CBA. This would insure the continuation of a company-union contract.

An examination of the Memorandum of Agreement reveals no reference to H.M.S. coverage for retirees who may have retired prior to or during the 1982 CBA. The only reference to Appendix F concerned vision care benefits which provided for Company contribution for contact lenses and a two-visit limitation for oral dental examination. (Exhibit 19, page 6).

The finalized 1985 CBA and its Appendix F continued to define the persons covered as was done in the previous 1982 CBA. The identical language in Appendix F was brought forward from the 1982 CBA as follows:

## SECTION A. HEALTH CARE BENEFITS FOR ACTIVE EMPLOYEES

### Article I—Definitions

1.1 An "Eligible Employee" shall be any regular full-time employee other than as indicated below.... The following shall be ineligible for coverage:

a. ...

b. Individuals who have quit or have been discharged or terminated from employment.

...

(Exhibit 21b, page 1).

The 1985 CBA contained no language which provided for the vesting of H.M.S. benefits to past retired employees.

Finally, the 1985 term clause as related to H.M.S. benefits is also identical to previous term clauses. The now familiar language of section 104 in the 1979 CBA, Exhibit 10a, page 55, was carried forward in the 1985 CBA as follows:

## XXXI

## HOSPITAL–MEDICAL–SURGICAL INSURANCE

104. The Hospital–Medical–Surgical Insurance Plan described in Appendix F,

attached to this Agreement, will remain in effect for the duration of this Agreement.

(Exhibit 21a, page 44).

## DISCUSSION—CONCLUSIONS OF LAW

In 1974 the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* was enacted to "protect interstate commerce in the interests of participants in employee benefit plans" by establishing disclosure and reporting requirements, standards of conduct for plan fiduciaries, and access to federal courts. 29 U.S.C. § 1001(b).[3]

■ Pension plans and employee benefit plans are two different categories under ERISA and are treated differently. Welfare plans are subject to the reporting and disclosure requirements and the fiduciary standards of ERISA; however, ERISA does not regulate the substance of the plans. *Anderson v. John Morrell & Co.,* 830 F.2d 872, 876 (8th Cir.1987), citing *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985).

> [ERISA] was not designed to prohibit modification of these ancillary [non-accrued] benefits. *See* H.R.Conf.R. No. 1280, 93d Cong., 2d Sess. 273, *reprinted in* 1974 U.S. Code Cong. & Ad. News 4639, 5038, 5054; H.R.Rep. No. 807, 93d Cong., 2d Sess. 60–61, *reprinted in* 1974 U.S. Code Cong. & Ad. News 4639, 4670–4726. Rather, Congress believed that the "vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." H.R.Rep. No. 807, 93d Cong., 2d Sess. 60, *reprinted in* 1974 U.S. Code Cong. & Ad. News 4890, 4935. An employer may change such benefits without violating ERISA.

*Anderson,* 830 F.2d at 876, quoting *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.,* 724 F.2d 406, 410 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

■ Pension plans provide retirement income to employees for periods extending beyond the termination of the employment. Therefore, they are presumably vested benefits. *See* 29 U.S.C. § 1002(2)(A). Pension plans are subject to ERISA's stringent vesting requirements, 29 U.S.C. § 1053 ("Each pension plan shall provide that employee's right to his normal retirement benefit is non-forfeitable upon the attainment of normal retirement age."). Welfare plans, on the other hand, are specifically exempt from these vesting requirements. 29 U.S.C. § 1051.

"In enacting ERISA, Congress apparently determined that subjecting employee welfare benefit plans to the same vesting, funding, and trust requirements as pensions plans would be so costly as to discourage employers from providing welfare benefits at all." *Schwartz v. Interfaith Medical Center,* 715 F.Supp. 1190, 1196 (E.D.N.Y.1989) citing, H.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4639–40.

■ Therefore, welfare benefits do not automatically vest as a matter of law and the benefits may be altered or terminated by the employer, absent some contractual agreement to the contrary. *Howe v. Varity Corp.,* 896 F.2d 1107, 1109 (8th Cir.1990) (citing *Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1516–17 (8th Cir.1988), *cert. denied sub nom. Anderson v. Slattery Group, Inc.,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989)).

This distinction between pension and insurance benefits is understandable in light of the nature of the benefits at issue. Pension benefits are fixed, easily calculable benefits. Employers can accordingly accurately estimate the costs of funding an employee pension plan. On the other hand, the costs of funding an employee welfare plan including health care benefits is unpredictable given the uncertainty of cost of medical care. With these principles in mind, the Court turns to their application in the context of this labor-management case.

---

**3.** The benefit package and pension plan at issue in this case constitutes a "plan" within the meaning of ERISA. Company witness John Powers testified that the 1985–88 Appendix is the official ERISA plan document. (Transcript of Court Trial (Tr.) Vol. II, pp. 329–30).

■ Generally, any rights conferred under a labor contract do not survive beyond the expiration of the CBA. *See, e.g., Merk v. Jewel Cos., Inc.,* 848 F.2d 761 (7th Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988). Therefore, if the health benefits are unambiguously limited to the term of the relevant agreement, the benefits are not vested. *Anderson v. Alpha Portland Indus., Inc.,* 647 F.Supp. 1109, 1126 (E.D.Mo. 1986), *aff'd,* 836 F.2d 1512 (8th Cir.1988) (citations omitted).

■ To be sure, the parties may provide that certain rights extend beyond the term of a CBA. *International Union, United Auto., Aero., & Agric. Implement Workers of Am. v. Yard–Man,* 716 F.2d 1476, 1479 (6th Cir. 1983), *cert. denied* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) citing *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964). Whether the benefits survive the expirations of the CBA depends on the intent of the parties. *Yard–Man,* 716 F.2d 1476 at 1479. In such a case, the retirees bear the burden of proving that the benefits are vested and not tied to the agreement which created them. *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.,* 771 F.Supp. 992, 998 (E.D.Mo.1991), *aff'd* 961 F.2d 1384 (8th Cir.1992), citing, *Local Union No. 150–A, United Food and Commercial Workers Int'l Union AFL–CIO v. Dubuque Packing,* 756 F.2d 66, 69–70 (8th Cir.1985); *see also, Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d at 1516–17; *DeGeare v. Alpha Portland Indus., Inc.,* 837 F.2d 812, 815 (8th Cir.1988), *vacated and remanded sub nom., DeGeare v. Slattery Group, Inc.,* 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989).[4] In *DeGeare* the Court stated:

> Regardless of whether the plan documents were the subject of negotiation, the plaintiffs must establish their case by a preponderance of the evidence if they are to prevail. Further, it is especially important that [retirees] bear the burden of proof in cases such as this where the benefits in question are unilaterally provided by the employer. Accepting plaintiffs' argument would lead to the anomalous result that Alpha would have to prove a negative—that it did not promise lifetime benefits—every time plaintiffs choose to file a lawsuit.

*DeGeare,* 837 F.2d at 815.

■ The burden does not shift simply because retirees are defendants in this declaratory judgment action. *See, e.g., Travelers Ins. Co. v. Greenough,* 88 N.H. 391, 190 A. 129 (1937). Morrell should not bear the burden of proof on an issue which has traditionally been held to be the retirees' burden simply because it expeditiously availed itself of the Declaratory Judgment Act. Therefore, the ultimate burden of proof remains on the defendants. *See Board of Regents of Univ. of Nebraska v. Dawes,* 522 F.2d 380, 383 n. 9 (8th Cir.1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976) (burden of proof in action under Equal Pay Act rested on defendant class even though University initiated the declaratory judgment action).

■ If the parties intended that the retiree health benefits vest upon retirement, then Morrell has no right to unilaterally alter or terminate those benefits without the retirees' consent. *See, e.g., Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971). On the other hand, Morrell may modify or terminate these benefits absent a *specific expression* of contrary intent by the employer. *Meester v. IASD Health Servs. Corp.,* 963 F.2d 194, 197 (8th Cir.1992), citing, *Howe v. Varity Corp.,* 896 F.2d 1107 (8th Cir.1990); *see also, Anderson v. John Morrell & Co.,* 830 F.2d 872, 877 (8th Cir.1987) (if employer undertakes to contractually provide indefinite welfare benefits, there must be a specific expression of the employer's intent to be bound).

---

4. The Supreme Court remanded *DeGeare* based on its decision in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Eighth Circuit noted in *Howe v. Varity Corp.,* 896 F.2d 1107, 1109 n. 4 (8th Cir. 1990) that the remand did not affect the central part of the *DeGeare* decision and the basic contract interpretation principles articulated therein still apply.

Accordingly, the issue facing the Court is whether the CBAs contain a "specific expression" of Morrell's intent to provide vested lifetime benefits to its eligible retirees. Under Eighth Circuit law, this issue is "simply one of contract interpretation." *Alpha Portland,* 836 F.2d at 1516 (quoting *Dubuque Packing,* 756 F.2d at 70.)

■ In determining whether the parties intended to provide vested health care benefits for retirees, the Court must first examine the language of the plan documents. *Alpha Portland,* 836 F.2d at 1517. If the contract is deemed ambiguous, then the Court may weigh extrinsic evidence to resolve the ambiguity. *Id.* An ambiguity exists if the contract language reasonably gives rise to two different interpretations.

■ Each provision of the CBA should be read consistently with the others and the terms must be construed to render none of them nugatory and to avoid illusory promises. *DeGeare,* 837 F.2d at 816, citing *Yard–Man,* 716 F.2d at 1479–80.

■ Guided by these principles, the Court finds that the retirees have not satisfied their burden of proving these benefits are vested lifetime benefits. The CBAs do not contain a specific expression of Morrell's intent to provide benefits beyond the term of the CBA. To the contrary, the CBAs expressly and unambiguously provide that the H.M.S. plan would remain in effect for the duration of the respective CBA.[5] In short, the language of the CBAs reflect the intent of the parties to limit retiree coverage to the term of the currently effective CBA.[6] It is not necessary to examine extrinsic evidence to determine the intent of these unambiguous contracts.

Morrell points out that each CBA contains a general duration clause and argues that this points to additional evidence the H.M.S. benefits cease at the end of the CBA term.

An example of these duration clauses is found in the 1976 CBA, Exhibit 2a, page 54, as follows:

### XXXVI

### TERM

111. Except as otherwise provided, all of the provisions of this Agreement shall take effect as of [the effective date] and shall remain in effect until [the termination date], ...

Similar language is found in the 1979 CBA, Exhibit 10a, page 57; 1982 CBA, Exhibit 13a, page 62 (also reflecting the reference to the various Memorandum of Agreements leading to the finalized 1982 CBA); 1985 CBA, Exhibit 21a, page 46.

The Court discounts Morrell's arguments and instead relies on the more specific term clause contained in each CBA relating specifically to H.M.S. benefits. While the Court discounts the importance of the general duration clause vis-a-vis the specific H.M.S. duration clause, this does not mean that the presence of the general duration clause is completely irrelevant to the Court's determination. It is inconsistent with the concept of vesting to hold that the retiree benefits continue for life in the face of a specific termination clause which limits the benefits to the term of the contract. In the somewhat unique context of labor-management relations, the nature of collective bargaining is such that CBAs of necessity terminate on a date certain to be followed and in most cases preceded by a new round of negotiations. Had UFCW sought permission to bargain for retirees, undoubtedly it possessed the knowledge of how to do so.

■ Despite a general desire that retired Morrell employees should have adequate H.M.S. coverage, the Court cannot transfer such desire into contract provisions in what

**5.** *See, e.g.,* Exhibit 1a, the 1973 CBA at page 52, ¶ 103.

**6.** The Court has not failed to note the argument of UFCW that to limit coverage to retirees for the length of the CBA would mean that if an employee retires one day before the expiration of the CBA there would be only one day of H.M.S. benefits provided. This argument is somewhat

attractive, but it does not consider the overriding principle that the labor-management agreements were *agreed* to terminate on a date certain. While the consequences may be unfair, indeed somewhat harsh, they do not provide a reason for the Court to make a contract for the parties based upon its own concept of fairness.

**1452**

otherwise are clear and unambiguous contracts which contain no such provisions.

The Court further finds that the coordination of benefits clauses found in the 1979, 1982, and 1985 CBAs are inconsistent with UFCW's vesting claim. The effect of a coordination of benefits clause is to require the company to pay benefits only to the extent of the difference between the full amount of the benefits allowable and the payments made toward such benefits under such other plan. 1979 CBA, Exhibit 10b, pages 46–47. *See also* 1982 CBA, Exhibit 13b, Article III, page 4, and 1985 CBA, Exhibit 21b, Article III, page 4. *Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1519 (8th Cir.1988).

The extrinsic evidence consisting of contract negotiations and Morrell's communications to retirees are at best inconclusive and itself ambiguous. The contracts themselves are the best evidence as to whether Morrell is required to provide fixed, lifetime H.M.S. benefits to retired employees. Much of the extrinsic evidence is contradictory and speculative. It forms no independent basis for the Court to depart from well-established rules of construction.[7]

 As the Court has found, there are no vested rights to fixed, lifetime H.M.S. benefits for Morrell retired employees. The fact that Morrell as a matter of policy has determined that it would not forsake those past employees in their health care coverage who had provided loyal and lengthy service to the Company hardly rises to the level required for estoppel. There is no showing that the retirees have in any way changed their position based upon any promise by the Company. Whether the doctrine of estoppel applied in an ERISA case may be an open question; however if it exists at all, it does not exist in this case.

The Court this date enters a judgment consistent with this opinion.

---

7. The Court has considered the issue of whether *Amcar Div., ACF Indus., Inc. v. NLRB,* 641 F.2d 561 (8th Cir.1981) provides it with a separate, independent ground on which to interpret these CBAs. The Court finds that *Amcar* is inapplica-

ble to this ERISA case. It is not authority for this Court to interpret an otherwise unambiguous contract by the use of the suggested extrinsic evidence.